OTJ

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



| | | |
|---|---|---|
| **RONALD F. SARGENT** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **VITALITY FOOD SERVICE, INC.,** | § | Civil Action No. |
| **VITALITY BEVERAGES, INC. f/k/a** | § | 402-CV-0018-A |
| **PASCO ACQUISITION I,** | § | |
| **PASCO BEVERAGE COMPANY f/k/a** | § | |
| **LYKES PASCO, INC., CAXTON -** | § | |
| **ISEMAN CAPITAL, INC. and** | § | |
| **ENGLES, URSO & FOLLMER** | § | |

### PLAINTIFF'S SECOND AMENDED COMPLAINT

Ronald F. Sargent ("Sargent") Plaintiff in the above-styled and numbered case, pursuant to the Court's Order dated October 28, 2002, files his Second Amended Complaint against Vitality Food Service, Inc., Vitality Beverages, Inc. f/k/a Pasco Acquisition I, Pasco Beverage Company f/k/a Lykes Pasco, Inc., Caxton-Iseman Capital, Inc., and Engles, Urso & Follmer, and states:

### I.   PARTIES

2.   Ronald F. Sargent ("Sargent") is a resident of Texas.

3.   Defendant Vitality Food Service, Inc. ("VFS") is a foreign corporation authorized to do business in the State of Texas. VFS has already appeared herein and summons is therefore unnecessary.

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 1**

4. Defendant Vitality Beverages, Inc. f/k/a Pasco Acquisition I ("VBI") is a foreign corporation that does business in Texas. VBI has already appeared herein and the Court has entered a judgment dismissing the claims against VBI without prejudice. That judgment is currently on appeal. Accordingly, summons is therefore unnecessary.

5. Defendant Pasco Beverage Company f/k/a Lykes Pasco, Inc. ("PBC") is a foreign corporation that does business in the State of Texas. PBC has already appeared herein and summons is therefore unnecessary.

6. Defendant Caxton-Iseman Capital, Inc. ("CIC") is a foreign corporation that does business in the State of Texas. CIC has already appeared herein and the Court has entered a judgment dismissing the claims against CIC without prejudice. That judgment is currently on appeal. Accordingly, summons is therefore unnecessary.

7. Defendant Engles, Urso & Follmer ("EUF") is a Texas corporation. EUF has already appeared herein and the Court has entered a judgment dismissing the claims against EUF with prejudice. That judgment is currently on appeal. Accordingly, summons is therefore unnecessary.

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 2**

```
```

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over this removed action pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332. Venue of this action is proper in the Northern District of Texas pursuant to 28 U.S.C. 1391(a) since a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of Texas.

## III. FACTS

9. Plaintiff Sargent is the owner of one hundred percent (100%) of the issued and outstanding shares of Dispenser Services of Texas, Inc. ("DST") and Dispenser Services of Houston, Inc. ("DSH"). For more than twenty (20) years DST and DSH have serviced the Dallas-Fort Worth Metroplex, Austin, San Antonio, Houston and large portions of the remainder of the State of Texas with juice based drink products, frozen concentrated juice, juice based drinks, coffee, tea, and other similar products. DST and DSH utilized and purchased proprietary dispensing equipment from VFS which would dispense various products purchased from VFS as concentrate.

10. For many years, both companies have purchased machines and raw materials from Lykes Pasco, Inc. f/k/a Lykes Pasco Packing Co. ("Lykes Pasco"). Plaintiff's

companies, DST and DSH, have built a strong customer base throughout the State of Texas including school districts, military bases, hotels, nursing homes, hospitals, colleges and other institutional users of such products. These business relationships have been formed over a period of years and both companies invested heavily in physical facilities, equipment, spare parts, vehicles, personnel and promotional activities to establish, maintain and promote such relationships. It has been a highly successful business.

11. In 1999, Sargent was informed that the ownership structure of Lykes Pasco had changed. Apparently, the Lykes Pasco business was purchased by a consortium of CIC and EUF and was consolidated into several entities. According to Defendants, VBI owns 100% of an entity called Vitality Holdings, L.L.C., which in turn, owns 100% of VFS. According to Defendants, VBI also owns 100% of an entity called Pasco Beverage Group, L.L.C., which in turn, owns 100% of PBC. According to Defendants, VBI is 100% owned by an entity called Pasco Acquisitions Holdings, L.L.C. Presumably, CIC and EUF are the owners, directly or indirectly, of Pasco Acquisitions, L.L.C. Following the change in ownership, DST entered into new distributorship

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 4**

agreements with VFS related to the Dallas, Austin and San Antonio markets. However, DSH continued to operate under its existing agreement with PBC, the successor to Lykes Pasco, in the Houston market.

12. In October of 1999, John Langdon, a representative of CIC and a director of VFS, and Tom Myers, Jerry McMillan and Joe McMahon came to Texas to meet with Sargent regarding the new ownership structure of Lykes Pasco. At that time, Langdon asked Sargent to sell DST and DSH. On November 17, 1999, Sargent received a letter from Langdon in which Langdon identified documents he needed to review to proceed with a purchase/sale of DST and DSH.

13. After receiving Langdon's November 17, 1999, letter, Sargent discussed the matter among members of his family who also worked for the businesses and decided that he was not interested in selling. He telephoned Langdon and told him that he had reached a decision not to sell his businesses. Langdon, however, threatened that if Sargent refused to sell it would not really matter because, "[I]n five years we are going to be the largest non-carbonated beverage company in the world and we will own distribution." The context of the conversation was clear, either Sargent could sell his businesses or VFS would run

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 5**

him out of business. Sargent then sent the requested documents to Langdon on December 2, 1999.

14. After Langdon and his associates had an opportunity to review the financial documents, Langdon told Sargent that they would be willing to pay Sargent between 4.5 and 4.75 times EBITDA plus private expenses. Between December 25, 1999 and December 31, 1999, Sargent compiled a list of private expenses and forwarded the list to Langdon.

15. On January 19, 2000, Sargent, Langdon, Todd Follmer (a director of VBI) and Wayne O'Daniel (the C.P.A. for DSH and DST) met to finalize the purchase. Sargent informed Langdon and Follmer that the deal would have to yield him cash, after taxes, of Four Million and No/100 Dollars ($4,000,000.00). Sargent and O'Daniel explained (1) that the purchase price would be $6,000,000; (2) Sargent would be responsible for debt of the business up to $1,000,000, yielding a net before tax price of $5,000,000; and (3) applying a capital gains tax rate of 20%, Sargent would receive a walk away amount of $4,000,000. To obtain this tax rate, the deal needed to be structured as a stock deal without reservation to Defendants of an IRC § 338 election. Langdon and Follmer stated that the transaction, structured as a stock deal without an IRC § 338 election,

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 6**

was acceptable. A stock purchase thus was agreed upon between Sargent and VFS. The parties agreed that the final dollar amount would be confirmed by January 24, 2000, so that it could be announced at a VFS board meeting on January 25, 2000. Upon information and belief, Langdon and/or Follmer informed VFS that a deal had been reached to buy Sargent's stock in DST and DSH and the deal was celebrated at a VFS dinner meeting that was held on the evening of January 24, 2001.

16. Sargent called Langdon on January 24, 2000, but Langdon had already left for Tampa, Florida to attend the VFS board meeting. On January 25, 2000, Sargent reached Langdon on his cell phone while he was in the board meeting. At that time, Follmer and Langdon confirmed the agreement for the purchase of Sargent's stock for a total sales price of Six Million and No/100 Dollars ($6,000,000.00), less up to One Million and No/100 Dollars ($1,000,000.00) in debt, to close by March 31, 2000. Upon information and belief, Follmer and Langdon announced the deal to the VFS board of directors.

17. VFS' subsequent conduct confirmed the existence of a binding agreement between the parties. For example, after January 25, 2000, a meeting was held between VFS,

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 7**

Sargent and the Draft Root Beer Company, a major supplier of Sargent's business. During the meeting, the purchase/sale transaction was discussed at length and, at the conclusion of the meeting, Draft Root Beer agreed to remain a supplier for Defendants after the closing of the transaction. Moreover, VFS' representatives told DST and DSH customers, including Sysco Food Services, Inc. ("Sysco") and International House of Pancakes, that Defendants and Sargent had entered into an agreement and that Defendants were taking over the business of DST and DSH. Similarly, during the month of February, VFS representatives continued to tell DST's and DSH's customers, suppliers and employees that an agreement had been reached and that it was a "done deal." Subsequent to the January 19, 2000, meeting, both Follmer and Langdon have submitted sworn statements to the Court asserting that they attended the January 19, 2000, meeting, at which the stock purchase was reached, as the agents of and on behalf of VFS.

18. Unfortunately, VFS tried to re-trade the deal. Notwithstanding the fact that the parties had expressly discussed and agreed that the deal would be a stock transaction without an IRC § 338 election, VFS tried to get

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 8**

Sargent to give it the right to structure the deal as an asset sale or to give it the right to make an IRC § 338 election. Sargent explained that an asset deal or an IRC § 338 election would destroy the utility of the sale by shifting a significant tax expense to Sargent. VFS then refused to close the deal.

    19. As set out above, for many years both companies had done business under requirements contracts to which VFS and PBC (and their predecessors in interest) had sold DST and DSH their needs. In full reliance upon these agreements, DST and DSH had spent great sums of money, time and effort buying equipment and developing a customer base for Defendants' products. When Defendants failed in their efforts to coerce Sargent into changing the terms of their deal, Defendants, acting in concert, gave notice of termination to Sargent regarding all of the supply contracts between DST and DSH, on the one hand, and VFS, VBI and PBC on the other. The obvious intention was to destroy Sargent's business and begin selling directly to the customers (and purchasing from the various other suppliers) that Sargent had introduced to VFS and to whom Defendants had told that an agreement had been reached with Sargent.

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 9**

20. In addition, VFS began interfering with the relationships between DST and DSH and their customers by telling Sysco that Sysco should begin servicing DST's and DSH's accounts as an agent for VFS. VFS also has caused a substantial reduction in revenues to DST and DSH by taking damaging actions with respect to "National Accounts." More recently, VFS raised the prices it charged to DST and DSH for VFS' products. This action made it extremely difficult for DST and DSH to compete in the marketplace. Defendants' price gouging tactic is especially egregious, unfair and in bad faith given the fact that the price being charged to Defendants for the raw product is lower than it has been in several years. DST and DSH, however, were not able to take advantage of these lower market prices due to contractual restrictions imposed by Defendants and due to the fact that Defendants required DST and DSH to buy and use dispensers that could dispense nothing but Defendants' products. In fact, now, Defendants have terminated their distributor relationship with DST and DSH and are refusing to sell DST and DSH any products whatsoever. Defendants' goal is clear. Rather than honor the agreement to buy Sargent's stock, Defendants intend to take Sargent's businesses from him for nothing. Without the detailed and intimate

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 10**

information they received as part of VFS' supposedly completed purchase of Sargent's businesses, they could not do this.

## IV. CAUSES OF ACTION

### A. Breach of Contract/Specific Performance.

21. Plaintiff incorporates the allegations contained in the preceding paragraphs.

22. Plaintiff and VFS entered into an agreement as to all material terms for the sale of Sargent's stock in DST and DSH. VFS breached the contract by failing and refusing to close the transaction. Moreover, VFS has availed itself of the fruits and benefits of the bargain. VFS' actions have caused damage to Plaintiff in an amount not less than $6,000,000, for which same is prayed. Plaintiff is also entitled to his attorneys' fees and costs. In addition, Plaintiff is entitled to and hereby seeks specific performance of the contract.

### B. Fraud.

23. Plaintiff incorporates the allegations in the preceding paragraphs.

24. On January 19, 2000, Sargent entered into an agreement as to all essential terms to sell his stock in DST and DSH to VFS. As stated above, Sargent met with

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 11**

Follmer, a director of VBI, and Langdon, a director of VFS, and both agreed to the purchase of Sargent's stock on the terms stated above. Subsequent to this meeting, and in affidavits filed with the Court, both Follmer and Langdon have stated that they were acting on behalf of VFS at the January 19, 2000, meeting.

25. Upon information and belief, at the time VFS entered into the agreement, it had no actual intention of fulfilling its obligations under the terms of the agreement. At the January 19, 2002, meeting and on the January 25, 2002, telephone call, Langdon and Follmer, on behalf of VFS, misrepresented VFS' intent to purchase Sargent's stock in order to obtain confidential information about Sargent's companies which VFS could use to unfairly compete with DST and DSH and put DST and DSH out of business. Sargent relied on the misrepresentations by releasing the confidential and proprietary information of DST and DSH to VFS and by introducing VFS to DST and DSH's vendors. Sargent would not have provided this information had he known VFS had no intention to close the transaction. Further, this information gave DST and DSH a competitive advantage in the marketplace and VFS' acquisition of such

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 12**

information allowed VFS to unfairly compete with DST and DSH.

26. As evidence of its fraudulent intent, upon obtaining the confidential information, VFS refused to consummate the agreement on the terms previously agreed to and instead has used the acquired information to unfairly compete with DST and DSH. Subsequently, VFS and PBC terminated their agreements with DSH and DST and now refuse to provide them with any products whatsoever. These actions have severely impacted DST and DSH's business and have, as a result, negatively impacted the value of Sargent's stock. As a result of VFS' conduct, Sargent has been damaged in an amount not less than $6,000,000 for which same is hereby prayed. Moreover, VFS' actions were intentional and malicious. Accordingly, Plaintiff is entitled to and hereby seeks to recover exemplary damages from VFS.

C. **Estoppel**.

27. Plaintiff incorporates the allegations set forth in the preceding paragraphs.

28. VFS, by its words and conduct, caused Plaintiff to detrimentally change his position. Specifically, VFS agreed to purchase Plaintiff's stock in DST and DSH and in

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 13**

reliance thereupon Plaintiff took a number of actions including introducing VFS' employees, agents and servants to his customers, suppliers, employees and vendors, granting free and full access to his various business records, and setting out specifications, uses, needs and other proprietary details of the businesses.  VFS has received the benefits of Plaintiff's actions.  Accordingly, VFS is estopped from denying or repudiating the agreement between Plaintiff and VFS, and Plaintiff is entitled to recover from VFS not less than $6,000,000.

D.   **Civil Conspiracy**.

29. Plaintiff incorporates the allegations set forth in the preceding paragraphs.

30.   Defendants VFS, VBI, PBC, CIC and EUF are separate and distinct legal entities.  Upon information and belief, each of these Defendants agreed with the others to engage in an unlawful course of conduct with respect to Sargent. The object of the conspiracy was to take over the distribution of Defendants' products in the markets serviced by DST and DSH while eliminating the threat that DST and DSH would effectively compete with Defendants in these markets by distributing products of suppliers other than Defendants.  The unlawful means employed was the

defrauding of Sargent with respect to the sale of his DST and DSH stock. As a result of this conspiracy, Sargent has been damaged in the amount of $6,000,000, as set forth herein. Moreover, Defendants' actions were intentional and malicious. Accordingly, Plaintiff is entitled to and hereby seeks to recover exemplary damages from Defendants.

E. **Attorney Fees and Costs**.

31. Plaintiff incorporates by reference the allegation contained in the preceding paragraphs.

32. Plaintiff has made written demand upon VFS to pay the amounts due to Plaintiff and otherwise has presented his claims to VFS. Pursuant TEX. CIV. PRAC. & REM. CODE § 38.001 and Tex. Bus. & Comm. Code. $27.01, et seq., Plaintiff is entitled to recover and hereby seeks recovery of his reasonable attorneys fees, costs, expert witness fees, copy expenses, etc, incurred in prosecuting his claims against VFS, including any attorneys' fees that may be incurred in connection with any appeal herefrom. In addition, Plaintiffis entitled to and hereby seeks to recover from Defendants, pre- and postjudgment interest, to the full extent allowed by law.

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 15**

## V. CONDITIONS PRECEDENT

33. All conditions precedent to bringing suit herein have been performed.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that Defendants be cited to appear and answer herein and that upon final hearing of this cause, Plaintiff have and recover from Defendants:

1. Actual damages in a sum of not less than Six Million and No/00 Dollars ($6,000,000.00);

2. Prejudgment interest at the highest legal rate;

3. Postjudgment interest;

4. Attorney's fees;

5. All costs of court; and

6. Such other and further relief at law or in equity to which Plaintiff may be justly entitled.

Respectfully submitted,

Baxter W. Banowsky
State Bar No. 00783593

**BANOWSKY, BETZ & LEVINE, P.C.**
2400 Univision Center
2323 Bryan Street
Dallas, Texas 75201
Telephone:  (214) 871-1300
Telecopier:  (214) 871-0038

**ATTORNEYS FOR PLAINTIFF
RONALD F. SARGENT**

PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 16

**CERTIFICATE OF SERVICE**

    This is to certify that a true and correct copy of the foregoing pleading has been forwarded, via First Class Mail, on the 31st day of October, 2002, to:

Albon O. Head, Jr.
William R. Jenkins, Jr.
Jackson Walker, L.L.P.
301 Commerce Street
Suite 2400
Ft. Worth, TX 76102

Clifton T. Huchison
Jamie Lavergne
Hughes & Luce, L.L.P.
1717 Main Street
Suite 2800
Dallas, TX 75201

                                                                  Baxter W. Banowsky

**PLAINTIFF'S SECOND AMENDED COMPLAINT - Page 17**